**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

WILLIE MACON,

       Plaintiff,

vs.                                                             CASE NO.:


KICHI TAIYAKI LAKELAND LLC
Florida Limited Liability Company        INJUNCTIVE RELIEF SOUGHT
d/b/a    KICHI    TAIYAKI    -
JAPANESE DESSERTS


       Defendant(s).


## COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues KICHI TAIYAKI LAKELAND LLC, Florida Limited Liability Company, d/b/a  KICHI TAIYAKI - JAPANESE DESSERTS ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1

1.      This action arises from Defendant's failure to make Defendant's online platform located at www.kichitaiyaki.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2.      MACON files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3.      Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4.      This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5.      Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6.      Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7.      Further, Defendant operates a Principal Place of Business with a physical address of 3958 Florida Ave S, Lakeland, Florida 33813 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8.      MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.      MACON is a natural person over the age of 18 and is blind.

3

10.    MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11.    MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12.    MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an

4

arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.     MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14.     MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15.     Defendant is a Florida Limited Liability Company with a principal place of business of 3958 Florida Ave S, Lakeland, Florida 33813 (hereinafter "Defendant's Principal Place of Business").

16.     Defendant operates Defendant's Website, through which customers can view information about Defendant's products and services, including menu offerings, specialty items, and promotions, as well as obtain contact information and details regarding Defendant's Principal Place of Business. Defendant's Website

provides general business information, such as hours of operation, location, and methods of communication, and is intended to facilitate customer engagement by allowing users to learn about and interact with Defendant's goods and services offered at Defendant's Principal Place of Business. In order to access, research, or purchase Defendant's products and services, consumers may visit Defendant's online store located at Defendant's Website.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website functions as an extension of Defendant's Principal Place of Business by providing customers with information necessary to visit and patronize Defendant's Principal Place of Business. Specifically, Defendant's Website displays Defendant's address, hours of operation, menu offerings, and contact information, thereby directing customers to Defendant's

6

Principal Place of Business and facilitating in-person transactions. Defendant's Website is intended to promote and increase foot traffic to Defendant's Principal Place of Business by allowing users to browse products and services online before visiting Defendant's Principal Place of Business to complete their purchases.

20.     At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.     MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.     There is a clear nexus between Defendant's Website and Defendant's Principal Place of Business, as Defendant's Website serves as a digital extension of

7

Defendant's Principal Place of Business by providing essential information that encourages and facilitates in-person visits. Defendant's Website prominently displays the address, hours of operation, menu offerings, and contact details for Defendant, allowing customers to learn about the goods and services offered and then travel to Defendant's Principal Place of Business to obtain them. In this way, Defendant's Website is directly integrated with the operations of Defendant's Principal Place of Business, functioning as a tool to promote, support, and increase customer traffic to Defendant's Principal Place of Business.

23. Defendant's Website is additionally used to search for brick-and-mortar locations, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to search and utilize Defendant's Website to review Defendant's goods and services available at Defendant's Principal Place of Business, and to access information such as menu offerings, location details, and contact information from his home, are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often difficult, hazardous, frightening, frustrating, and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software,

thereby denying MACON equal access to the benefits and information offered through Defendant's Website.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. March 06, 2026;

b. March 20, 2026; and

c. April 05, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.    While notice to Defendant is not required, MACON sent a pre-suit communication on March 20, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.    Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.    However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.    MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.    On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.   Congress found, among other things, that:

a.   some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.   historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.   discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.   individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.   the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on

11

an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns,

leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37.    More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

---

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

[2] 42 U.S.C. § 12188(b).

[3] 42 U.S.C. § 12188(a).

[4] Johnson, *supra* note 8.

38.    Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39.    The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40.    Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41.    Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, operating hours, and access to products found at Defendant's Principal Place of Business and address to Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing customers with the ability to search for, review, and evaluate Defendant's goods and services prior to visiting Defendant's Principal Place of Business, as well as obtain directions and essential information necessary to access Defendant's Principal Place of Business. Defendant's Website is integrated with the operations of Defendant's Principal Place of Business by promoting the goods and services offered at Defendant's Principal Place of Business and encouraging in-person patronage of Defendant's Principal Place of Business, thereby creating a direct and continuous connection between Defendant's Website and Defendant's Principal Place of Business.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American

15

civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.    Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.    Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.    Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other

16

individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.    According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.    Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied

17

full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50.    MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    **a.**    **Missing Skip to Content Link**

        i. **Issue:** The webpage lacks a "Skip to Content" link positioned at the top, forcing keyboard and screen reader users to navigate through repetitive navigation links and header content with each page load. This omission prevents users from swiftly reaching the main content, posing a

significant barrier for individuals reliant on keyboard navigation or assistive technology.



ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** The absence of a "Skip to Content" link at the top of the webpage obliges keyboard and screen reader users to repeatedly traverse navigation links and header content, impeding swift access to the main content. This deficiency creates a substantial obstacle for users of keyboard navigation and assistive technologies. Expected Behavior: A visible "Skip to Content" link should be the first focusable element on the page. Activation should shift keyboard focus directly to the main content area, enabling users to bypass repetitive navigation and access primary content efficiently.

b.    **Page Heading Does Not Clearly Describe the Page Purpose**

19

i. **Issue:** The level 1 heading titled "ABOUT US" fails to adequately convey the specific purpose or content of the page. Screen reader users depend on the <h1> heading for a quick understanding of the page's main topic. A vague or overly general heading poses an insurmountable barrier, as users cannot discern the information the page provides, hindering efficient navigation by those reliant on heading navigation.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** The insufficiently descriptive level 1 heading "ABOUT US" leaves screen reader users without a clear understanding of the page's specific purpose or content. This lack of clarity creates a significant barrier, preventing efficient navigation and comprehension of the page's

20

purpose for those who rely on heading navigation. Expected Behavior: The <h1> heading should clearly and accurately describe the page's specific purpose, offering meaningful insight into the content users will encounter. A descriptive heading facilitates prompt comprehension and navigation for screen reader users.

**c.**     **Menu and Menu Items Cannot Be Navigated Using Arrow Keys**

i.  **Issue:** The menu and its items are not navigable using arrow keys. When focus is placed on the menu, arrow key presses fail to shift focus between items, creating an insurmountable barrier for keyboard and screen reader users who rely on this method for menu navigation. Consequently, users cannot efficiently access or interact with menu items using standard keyboard navigation patterns.



ii. **WCAG 2.1 AA Violations:** 2.1.1 - A - Menubar

iii. **Impact:** The inability to navigate the menu and its items via arrow keys severely impedes keyboard and screen reader users, who depend on such navigation for effective interaction with menu structures. This limitation significantly hinders users from efficiently accessing or interacting with menu items using established keyboard navigation techniques. Expected Behavior: The menu should enable standard keyboard interaction, allowing users to move between items with Up and Down Arrows (or Left and Right for horizontal menus). Focus should seamlessly transition between menu items, ensuring accessibility for keyboard and assistive technology users.

d.      **Logo Image Has Incomplete Alternative Text**

22

i.  **Issue:** The "KICHITAIYAKI OFFICIAL" logo image contains incomplete alternative text, omitting the full visible text of the logo. This omission creates an insurmountable barrier for screen reader users, leaving them without the equivalent information that sighted users receive. As a result, users reliant on assistive technology cannot correctly identify the brand name depicted in the image, hampering understanding of the logo's purpose.



ii.  **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii.  **Impact:** The incomplete alternative text for the "KICHITAIYAKI OFFICIAL" logo image deprives screen reader users of the full information visible to sighted users, creating a barrier to correctly identifying the brand name. This oversight prevents users from gaining a proper understanding of the logo's significance. Expected

Behavior: The logo image should feature a comprehensive and accurate alt attribute that includes the full visible text. This ensures screen reader users receive the same information as sighted users, making the logo's meaning accessible to all.

**e.      Non-Heading Text Incorrectly Marked as Headings**

i.  **Issue:** Texts like "Soufflé Pancakes", "Taiyakis & Soft Serve", and "Bingsu & Boba Tea" are incorrectly marked as headings, despite not functioning as true section headings. These texts are labels or short phrases rather than titles for structured content sections, leading to incorrect structural information for screen reader users navigating by headings. Consequently, users cannot accurately understand the page's content structure or identify meaningful sections.



ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** Incorrectly marking texts such as "Soufflé Pancakes", "Taiyakis & Soft Serve", and "Bingsu & Boba Tea" as headings misleads screen reader users by providing inaccurate structural information. This error makes it difficult for users to comprehend the real content structure and identify meaningful sections on the page. Expected Behavior: Only text introducing a meaningful content section should be marked as a heading element like <h1>, <h2>, or <h3>. If texts like "Soufflé Pancakes", "Taiyakis & Soft Serve", and "Bingsu & Boba Tea" are merely labels or decorative, they should be formatted using standard text elements like <p> or <span>, ensuring the heading structure accurately reflects the page organization.

f. **Decorative Image Carousel Exposed to Screen Readers**

i. **Issue:** The decorative images within the carousel gallery are being read by screen readers despite lacking informative content. This results in screen reader users having to endure

25

unnecessary announcements for each decorative image while they navigate the page, creating a barrier to efficient navigation and hindering focus on significant information.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** The exposure of decorative images in the carousel gallery to screen readers leads to an inundation of redundant information for users who rely on assistive technologies. This unnecessary auditory clutter disrupts their ability to navigate and concentrate on meaningful content on the page. The recommended solution is to conceal these non-informative images from assistive technologies by using an empty alt attribute (alt="") or aria-hidden="true", ensuring that only relevant information is announced.

g. **Incorrect Heading Level Used for Section Title**

26

i.  **Issue:** The section heading "KICHI TAIYAKI - JAPANESE DESSERTS" is assigned an <h4> element instead of an <h2>, disrupting the logical structure of the page. This misalignment impairs the ability of screen reader users to comprehend the page's organizational hierarchy and to navigate between different sections efficiently.



ii.  **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii.  **Impact:** The incorrect heading level for "KICHI TAIYAKI - JAPANESE DESSERTS" impairs screen reader users' understanding of the page's structure, as the misleveling of the heading interrupts the expected logical flow, making it difficult to navigate and understand the content hierarchy. Correcting the heading level to an <h2> would provide

clarity and facilitate efficient navigation for assistive technology users.

**h.     The "Read More" Link Is Not Descriptive**

i.  **Issue:** The "READ MORE" link lacks context, failing to describe its destination or purpose. Screen reader users, who often navigate using a list of links, are left without crucial information about what content will open upon activation of the link, rendering it ineffective.



ii.  **WCAG 2.1 AA Violations:** 2.4.4 - A - Link Purpose In Context

iii.  **Impact:** The nondistinctive "READ MORE" link text leaves screen reader users without an understanding of its purpose or destination. This creates confusion and hinders their ability to navigate content accurately. To improve

28

accessibility, links should have descriptive text specifying the content they lead to, ensuring clarity and usability for all users.

## i.     Submenu Items Announced with Identical Name by Screen Reader

i.  **Issue:** As screen readers navigate through submenu items "TAIYAKIS & SOFT SERVE SOUFFLE PANCAKES BINGSU & BOBA TEA CHICKEN & MEAL COMBO," they announce the same combined name for all items, preventing users from distinguishing between them.



ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A - Menubar

iii.  **Impact:** The indistinguishable announcements of submenu items by screen readers impede the ability of users to identify individual links, inhibiting effective navigation and

interaction with the menu. Each submenu item should have a unique, programmatically defined name that matches its visible text to ensure clarity and usability.

**j.      Current Menu Item State Not Defined**

i.  **Issue:** The "SOUFFLE PANCAKES" menu item is visually marked as active but lacks a programmatically defined active state, making it unclear to screen reader users that it represents the current page.



ii.  **WCAG 2.1 AA Violations:** 4.1.2 - A - Name Role Value

iii.  **Impact:** The absence of a programmatically defined active state for the "SOUFFLE PANCAKES" menu item prevents screen reader users from understanding their current location within the website's navigation. Implementing an aria-current="page" attribute would allow assistive

30

technologies to announce the current page, enhancing orientation and navigation for users.

**k.   Food Menu Provided as Image of Text**

i. **Issue:** The food menu on the page is displayed as an image of text rather than actual text. This prevents screen reader users from accessing the information within the image. Consequently, individuals who depend on assistive technology cannot perceive the menu items, prices, or descriptions displayed in the image, creating an insurmountable barrier to accessing essential information about the food offerings available on the page.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 1.4.5 -AA - Non Text Content

31

iii. **Impact:** Users with visual disabilities, especially those who are blind and utilize screen readers, face significant obstacles as they are unable to access the food menu provided as an image of text. This results in a complete lack of access to crucial details such as menu items, prices, and descriptions, severely impacting their ability to make informed choices about the available food offerings.

51.    Defendant's Website was subsequently visited by Plaintiff's expert, Till Paris, on or about March 8, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers continue to render Defendant's Website inaccessible to users who are blind and visually disabled, including MACON.

52.    More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

53.    There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites

32

accessible. Incorporating such basic components to make the Defendant 's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

54.     Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55.     To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraph 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56.     Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57.     Here, however, MACON, through counsel, did send a pre-suit communication informing of the barriers to access on March 20, 2026. As such,

33

Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58.    As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59.    Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60.    Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61.    MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62.    Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

   a.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to

34

ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b.  Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c.  Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

35

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A.    A declaration that Defendant's Website is in violation of the ADA;

B.    An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.    An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.    An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.   An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F.   An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.   An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.   An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.   An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's

Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K.      An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.      Such other and further relief as the Court deems just and equitable.

Dated: July 28, 2026                    Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com

38

**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**